# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| DANIEL FRYE; MARY JEAN SHINER; JEFFREY J. DICKINSON; NATIONAL FEDERATION OF THE BLIND, INC.; NATIONAL FEDERATION OF THE BLIND OF NEW HAMPSHIRE, INC.; and GRANITE STATE INDEPENDENT LIVING, <br><br> Plaintiffs, <br><br> vs. <br><br> WILLIAM M. GARDNER, in his official capacity as the Secretary of State of New Hampshire; and the NEW HAMPSHIRE DEPARTMENT OF STATE, <br><br> Defendants. | Case No.: 20-cv-751 |

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Harman v. Forssenius*, 380 U.S. 528, 537 (1965). To protect that freedom of choice and avoid voter coercion, intimidation, and fraud, "New Hampshire's elections laws have long preserved voter privacy." *Sumner v. N.H. Sec'y of State*, 168 N.H. 667, 670 (2016); *see also Burson v. Freeman*, 504 U.S. 191, 206 (1992) (remarking that the secret ballot is an important defense against "voter intimidation and election fraud").

Although New Hampshire expects record use of absentee voting in the upcoming September 8 and November 3, 2020 elections in light of COVID-19, it has not made provisions

1

to allow print-disabled voters, including those who are blind[1] or have disabilities affecting manual dexterity, access to the safety and convenience of a private, independent absentee vote. The absentee voting program in New Hampshire, including absentee registration, requesting an absentee ballot, and voting itself, is inaccessible to print-disabled voters, like Plaintiffs Daniel Frye, Mary Jean Shiner, Jeffrey Dickinson, members of the National Federation of the Blind, Inc. ("NFB"), and NFB of New Hampshire, Inc. ("NFB-NH"), and clients of Granite State Independent Living ("GSIL"), because it requires them to rely on third parties to complete the paper ballots, as well as the forms to register to vote absentee and apply for an absentee ballot. New Hampshire requires voters with disabilities, but not voters without disabilities, to trade their right to vote absentee for their right to vote independently and in secret.

By denying print-disabled voters private and independent access to use of the absentee voting program based on their disabilities, New Hampshire violates Title II of the Americans with Disabilities Act of 1990 ("ADA" or "Title II"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 *et seq*. The COVID-19 pandemic renders the choice to which New Hampshire puts print-disabled voters particularly harmful. Such voters must either forfeit their right to vote privately and independently by relying on a third-party to assist them with an inaccessible paper ballot or risk their health and the health of their loved ones by casting their vote in person. This choice is not necessary. The tools are available and can be implemented in time for New Hampshire to offer a secret and accessible absentee voting program to all voters, including Plaintiffs. A preliminary injunction is needed to require Defendants to implement and publicize such a solution prior to the September 8, 2020

---

[1] The term "blind" is used in its broadest sense to include all persons who, under federal civil rights laws, have a vision-related disability that requires alternative methods to access print.

primary to prevent the immediate, irreparable harm that print-disabled voters would otherwise suffer.

## STATEMENT OF FACTS

### I. COVID-19's Effect on New Hampshire's Upcoming Elections.

In New Hampshire, as of July 6, 2020, there have been 5,914 total cases of COVID-19 and 382 deaths. *COVID-19 Summary Dashboard*, N.H. Dep't of Health & Human Servs., https://www.nh.gov/covid19/dashboard/summary.htm (last visited July 7, 2020). COVID-19 poses a particular threat to people with disabilities. Adults with disabilities are three times more likely than adults without disabilities to have serious underlying medical conditions that place them at a higher risk of severe illness from COVID-19. *See Coronavirus Disease 2019 (COVID-19): People with Disabilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last visited July 7, 2020). The Select Committee on 2020 Emergency Election Support ("Select Committee") appointed by Defendant Gardner recently advised that the safety of the upcoming elections on September 8 and November 3 is "highly dependent on a robust use of absentee registration and voting," *Report of the Select Committee on 2020 Emergency Election Support* 8 (2020), https://sos.nh.gov/WorkArea/ DownloadAsset.aspx?id=8589999347 (hereinafter "*Select Committee Rpt.*"), and that the state must "encourage absentee balloting in greater numbers, thus allowing for a safer environment on election day at the polls," *id.* at 12. Defendant Gardner has issued guidance clarifying that, due to COVID-19, all voters have a right to register and vote absentee. Mem. from William M. Gardner, Sec'y of State, & Gordon J. MacDonald, Att'y Gen., to N.H. Election Officials 1 (April 10, 2020), https://www.nhpr.org/sites/nhpr/files/202004/covid-19_elections_guidance.pdf (hereinafter "Absentee Voting Guidance"); Mem. from William M. Gardner, Sec'y of State, &

Gordon J. MacDonald, Att'y Gen., to N.H. Election Officials 1 (June 3, 2020) (hereinafter "Voter Registration Guidance"), https://sos.nh.gov/WorkArea/DownloadAsset.aspx?id=8589999164. Accordingly, the Select Committee estimates that between twelve to seventeen times more voters than usual will cast absentee ballots in the upcoming elections. *Select Committee Rpt.*, *supra*, at 9.[2]

## II. New Hampshire's Absentee Voting Program Is Inaccessible.

All stages of New Hampshire's absentee voting program require submitting paperwork to the voter's town or city clerk's office. New Hampshire, unlike other states, does not offer voters an option for requesting, receiving, filling out, or submitting an absentee ballot electronically. Compl. ¶¶ 58–62. As a result, this process is inaccessible to voters, like Plaintiffs, who have print disabilities, because they cannot independently read or mark the paperwork. Compl. ¶¶ 68, 71. The accessibility issues with New Hampshire's absentee voting program include: (1) guidance issued by the Defendant related to voting during the pandemic, such as a fact sheet on registering to vote by mail, is inaccessible to individuals using screen-reading software,[3] Ex. 1, Frye Decl. ¶ 16(c); Ex. 2, Shiner Decl. ¶ 10; N.H., *Covid-19 Related Registration and Voting Instructions*, http://sos.nh.gov/WorkArea/DownloadAsset.aspx?id=8589999336; (2) the form affidavit for voters registering absentee because of physical disability is not an electronic fillable form that can be read and completed by a blind person using a screen-reader, and it must be signed by hand, N.H., *Absentee Voter Registration Form – Physically Disabled*, https://sos.nh.gov/

---

[2] The Court may take judicial notice of these government documents. *See Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (court may take judicial notice of facts stated in official government website that are not reasonably in dispute); *Rivera v. Marriott Int'l, Inc.*, No. CV 19-1894 (GAG), 2020 WL 1933968, at *4 (D.P.R. Apr. 22, 2020) (citing *Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995)).

[3] Screen readers are a class of software that convey to a blind person what sighted people see on a screen via text-to-speech or a refreshable Braille display.

WorkArea/DownloadAsset.aspx?id=8589999328; (3) the Application for State Election Absentee Ballot must be printed and signed by hand, Ex. 1, Frye Decl. ¶ 16(a); Ex. 3, Dickinson Decl. ¶ 14(b); *see* Ex. 2, Shiner Decl. ¶ 12; N.H., *Application for State Election Absentee Ballot-RSA 657:4: Absence, Religious Observance, and Disability*, https://sos.nh.gov/WorkArea/DownloadAsset.aspx?id=8589999327; and (4) absentee ballots and the voter attestation are transmitted, marked, and returned entirely on paper, Compl. ¶ 70.

Voters with print disabilities cannot fill out or sign their ballots and other paperwork without assistance. Thus, a print-disabled voter must disclose their party affiliation (on the Application for State Election Absentee Ballot for the primary) and their vote (on their ballot) to the person assisting them. Compl. ¶¶ 69, 71. Even if a print-disabled voter was willing to sacrifice the secrecy of their vote, many do not have assistance in their homes and thus may not be able to participate in the absentee voting program at all. Compl. ¶ 72. If their health prevents them from voting in person, they will be entirely deprived of their right to vote.

Plaintiffs and other individuals and organizations of people with disabilities have repeatedly informed Defendants that the absentee voting program is inaccessible and suggested solutions, to no avail. Ex. 6, Care Decl. ¶¶ 5–10. Non-disabled New Hampshire residents may participate in the absentee voting program independently and privately during the COVID-19 pandemic. New Hampshire affords individuals with print disabilities neither privilege.

### III. Plaintiffs

Daniel Frye is a legally blind New Hampshire resident living in Concord. Ex. 1, Frye Decl. ¶¶ 2, 4. He is a member of the NFB-NH and NFB. *Id.* ¶ 5. He is a registered voter who has regularly voted in past New Hampshire elections. *Id.* ¶ 3. Mr. Frye intends to vote absentee this year because he does not feel safe voting in person due to the COVID-19 pandemic. *Id.* ¶ 10. Mr.

Frye would not be able to verify whether the people at his polling place were taking proper safety precautions; could not ensure that he remained six feet away from others; and is concerned that he will be grabbed without his permission. *Id*. ¶ 11. Mr. Frye's wife is immunocompromised, which is an additional reason he cannot risk exposure to COVID-19. *Id*. Unless Defendants make the absentee voting program accessible, Mr. Frye will not be able to apply for a ballot or vote absentee privately and independently. *Id*. ¶¶ 12–20.

Mary Jean Shiner is a totally blind New Hampshire resident living in Exeter. Ex. 2, Shiner Decl. ¶¶ 2, 4. She is a member of the NFB-NH and NFB. *Id*. ¶ 5. She is a registered voter who has regularly voted in past New Hampshire elections. *Id*. ¶ 3. Ms. Shiner intends to vote absentee this year because she does not feel safe voting in person due to the COVID-19 pandemic. *Id*. ¶¶ 7, 9. Ms. Shiner would not be able to confirm that other voters and election officials are taking proper precautions, such as wearing protective equipment and adhering to appropriate social distancing guidelines. *Id*. ¶ 8. Further, she is unable to use the one4all in-person voting machine keyboard while wearing gloves to protect herself from exposure. *Id*. Unless Defendants make the absentee voting program accessible, Ms. Shiner will not be able to apply for a ballot or vote absentee privately and independently. *Id*. ¶¶ 10–16.

Jeffrey Dickinson is a New Hampshire resident living in Franklin and is the Advocacy Director and a client of GSIL. Ex. 3, Dickinson Decl. ¶¶ 2–3. He is a registered voter who has regularly voted in past New Hampshire elections. *Id*. ¶ 6. Mr. Dickinson intends to vote absentee this year because he does not feel safe voting in person due to the COVID-19 pandemic. *Id*. ¶ 8. Unless Defendants make the absentee voting program accessible, Mr. Dickinson will not be able to apply for a ballot or vote absentee privately and independently. *Id*. ¶¶ 14–17.

Plaintiffs NFB and NFB-NH are non-profit membership organizations of blind individuals and their families and friends. NFB and NFB-NH advance their members' right to participate fully and equally in all aspects of their lives, including by ensuring their blind members have equal access to voting. Ex. 4, Blake Decl. ¶¶ 3–4; Ex. 1, Frye Decl. ¶¶ 7–8. NFB and NFB-NH have many blind members, including Mr. Frye and Ms. Shiner, who are eligible to vote in New Hampshire and wish to participate in the state's absentee voting program on an equal and independent basis in upcoming elections, including the September 8 and November 3, 2020 elections. Ex. 4, Blake Decl. ¶ 5; Ex. 1, Frye Decl. ¶ 9.

GSIL is an independent living center serving persons with all kinds of disabilities throughout New Hampshire, and its mission is to enhance opportunities for all people with disabilities to direct their own lives. Ex. 5, Ritcey Decl. ¶¶ 3–4. GSIL has numerous clients who are eligible to vote in New Hampshire and wish to participate in New Hampshire's absentee voting program on an equal and independent basis in upcoming elections, including the September 8 and November 3, 2020 elections. *Id.* ¶ 7.

## ARGUMENT

In evaluating a request for a preliminary injunction, the Court considers

> [1] the movant's likelihood of success on the merits; [2] whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief; [3] the balance of relative hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and [4] the effect, if any, that an injunction or the lack of one may have on the public interest.

*Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 52 (1st Cir. 2020) (citation and alteration omitted). "The first two factors are the most critical." *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010). Where the government is the defendant, the harm to the opposing party and effect on the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

I.     **Plaintiffs Are Likely to Succeed on the Merits.**

To prevail on their Title II and Section 504 claims, Plaintiffs must show (1) that they are "qualified individual[s] with a disability"; (2) that they were "either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or [were] otherwise discriminated against"; and (3) that they were excluded, denied benefits, or discriminated against "by reason of [their] disability." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000).[4]

A.     **Plaintiffs are qualified individuals with disabilities.**

Because Plaintiffs are blind, have Muscular Dystrophy, and/or other disabilities, are eligible to vote in New Hampshire, and are eligible to cast an absentee ballot in the upcoming primary and general elections, they are "qualified individual[s]" with disabilities. *See, e.g.*, 42 U.S.C. §§ 12102(1), 12131(2); 29 U.S.C. § 705(20)(B); *Doe v. Rowe*, 156 F. Supp. 2d 35, 58 (D. Me. 2001) (ruling that plaintiffs with intellectual disabilities who were otherwise eligible to vote but for the state's discriminatory constitutional provision disenfranchising them were "qualified individuals with disabilities" regarding the state's electoral activities).

B.     **By refusing provide a way for Plaintiffs to participate in New Hampshire's absentee voting program privately and independently, Defendants discriminate against Plaintiffs because of their disabilities.**

Title II covers a broad spectrum of unlawful "discrimination" in government "services, programs, [and] activities." 42 U.S.C. § 12132. The state discriminates when, among other things, it: (1) "[a]fford[s] a qualified individual with a disability an opportunity to participate in

---

[4] Section 504 is generally co-extensive with Title II of the ADA. *Parker*, 225 F.3d at 4. The only additional element for a Section 504 claim is that the defendant must receive federal funding. 29 U.S.C. § 794(a). The New Hampshire Department of State receives federal funds to help administer its elections. *See Select Committee Rpt.*, *supra*, at 1. Plaintiffs' references to the "ADA" and "Title II" in this Memorandum include both the ADA and Section 504.

8

or benefit from" a state "benefit[] or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii); (2) "provide[s] a qualified individual with a disability with a[] . . . service that is not as effective in affording equal opportunity to obtain the same result[] [or] to gain the same benefit . . . as that provided to others," *id.* § 35.130(b)(1)(iii); (3) fails to "make reasonable modifications in policies, practices, or procedures" when "necessary" to afford people with disabilities an equal opportunity to access the state's services, programs, and activities, *id.* § 35.130(b)(7)(i); and (4) fails "to ensure that communications with . . . participants[] [and] members of the public . . . with disabilities are as effective as communications with others," including by failing to provide appropriate auxiliary aids and services, *id.* § 35.160(a)(1), (b).[5]

In the parlance of Section 504, a violation of these regulations is a failure to provide "meaningful access," a standard that "incorporates rather than supersedes applicable interpretive regulations." *Pollack v. Reg'l Sch. Unit 75*, 886 F.3d 75, 81 (1st Cir. 2018) (citation omitted); *see also Kiman v. N.H. Dep't of Corr.*, No. 01-CV-134-JD, 2007 WL 2247843, at *8 (D.N.H. Aug. 1, 2007) ("Pursuant to another Title II provision, the Attorney General has promulgated regulations consistent with section 504 and the other titles of the ADA." (citation omitted)), *on reconsideration in part* 2007 WL 2688895 (D.N.H. Sept. 13, 2007). Defendants' refusal to accommodate Plaintiffs' disabilities in its absentee voting program is discriminatory within the meaning of Title II and Section 504.

1. **Absentee voting is a program, service, or activity of Defendants.**

The ADA applies to all of a public entity's "services, programs, or activities." 42 U.S.C. § 12132. This language is broad, "bringing within its scope anything a public entity does."

---

[5] The Department of Justice's Title II regulation receives *Chevron* deference. *Parker*, 225 F.3d at 5 n.5.

*Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (alteration and citation omitted); *see also Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled . . . ."); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir. 1997) (Title II covers any "normal function of a governmental entity"), *superseded on other grounds by* Fed. R. Civ. P. 52; *Doe v. Mass. Dep't of Corr.*, No. CV 17-12255-RGS, 2018 WL 2994403, at *8 (D. Mass. June 14, 2018) (noting that "services, programs, or activities" is "a catchall phrase that prohibits all discrimination by a public entity" (quoting *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012))).

The absentee voting program is a program or service within the meaning of the ADA. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503–05 (4th Cir. 2016). Consequently, absentee voting and absentee registration, not only "voting in its entirety," must be made accessible. *Id.*; *see Parker*, 225 F.3d at 5 ("All together, 'the program access requirement of title II should enable individuals with disabilities to participate in and benefit from the services, programs, or activities of public entities in all but the most unusual cases.'" (quoting *Nondiscrimination on the Basis of Disability in State and Local Government Services*, 56 Fed. Reg. 35,694, 35,708 (July 26, 1991))).

### 2. The inaccessible absentee voting program discriminates against Plaintiffs because of their disabilities.

By requiring voters to fill out paper documents by hand to participate in the absentee voting program, Defendants violate the ADA. Voters with print disabilities must ask someone to read them the forms, fill them out, and guide them to the signature line. This process violates Plaintiffs' right to communicate with the government "in accessible formats, in a timely manner,

and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2). The law does not permit Defendants to require disabled individuals to rely upon the kindness, availability, and accuracy of nondisabled third parties to assist them. "One of the explicit policies underlying the enactment of Section 504 was to ensure that" federally financed programs were "'carried out in a manner consistent with the principles of . . . respect for the privacy, rights, and equal access (including the use of accessible formats), of . . . individuals [with disabilities].'" *Nat'l Ass'n of the Deaf v. Harvard Univ.*, No. 3:15-CV-30023-MGM, 2016 WL 3561622, at *2 (D. Mass. Feb. 9, 2016) (alterations in original) (quoting 29 U.S.C. § 701(c)(2)), *report and recommendation adopted*, No. CV 15-30023-MGM, 2016 WL 6540446 (D. Mass. Nov. 3, 2016); *see, e.g.*, *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1264 (D.C. Cir. 2008) (holding that people with disabilities lack "meaningful access" when they have "to ask for help – to rely on the kindness of strangers").

The right to private, independent communication is particularly important when voting. "[A] secret ballot [is] necessary to cure electoral abuses." *Burson*, 504 U.S. at 207. Voters with print disabilities are not afforded this basic right. Such a system denies print-disabled voters an equal opportunity to participate in the absentee voting program, affords them a service that is not as effective as that provided to other voters, and fails to satisfy the state's obligation to provide equally effective communication. *See Lamone*, 813 F.3d at 506; *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 198–99 (2d Cir. 2014) ("[T]he relevant benefit . . . includes the option to cast a private ballot on election days. Indeed, to assume the benefit is anything less—such as merely the opportunity to vote at some time and in some way—would render meaningless the mandate that public entities may not afford persons with disabilities services that are not equal to that afforded others." (alteration and citation omitted)).

Other courts have affirmed that people with disabilities have the right to independent, private access to all pathways to vote that a state makes available to people without disabilities. In *Lamone*, the Fourth Circuit held that Maryland election officials violated Title II and Section 504 by relying on paper absentee ballots. Affirming "that by effectively requiring disabled individuals to rely on the assistance of others to vote absentee, defendants have not provided plaintiffs with meaningful access to Maryland's absentee voting program," the court explained:

> Voting is a quintessential public activity. In enacting the ADA, Congress explicitly found that "'individuals with disabilities . . . have been . . . relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals.'" Ensuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others, 28 C.F.R. § 35.130, helps ensure that those individuals are never relegated to a position of political powerlessness.

813 F.3d at 507 (quoting *Tennessee v. Lane*, 541 U.S. 509, 516 (2004)). In *National Organization on Disability v. Tartaglione*, the court recognized that plaintiffs who were excluded from in-person voting faced discrimination, even though they could vote absentee, because they could not "participate in the program or benefit of voting in the same manner as other voters but, instead, must participate in a more burdensome process." No. CIV. A. 01-1923, 2001 WL 1231717, at *4 (E.D. Pa. Oct. 11, 2001). Defendants may not forgo providing an accessible path to its absentee voting program merely because people with disabilities could vote in person.

### 3. Reasonable modifications and auxiliary aids and services would allow Plaintiffs meaningful access to the absentee voting program.

The state's absentee voting program need not be inaccessible. Electronic ballot marking is easily implemented. Commercially available software allows people with disabilities to receive their absentee ballots online, mark them on the computer, and return them to election officials, either via mail or electronic return. Several states deploy such systems, and others plan to during the upcoming 2020 elections. Ex. 4, Blake Decl. ¶¶ 8–10, 17. Maryland makes its

ballot marking software available to other states for free, and both Prime III and MyBallot are also available free of charge. *Id.* ¶¶ 13–14. Defendants can procure an online ballot marking system in time for the September 8, 2020 election. *Id.* ¶¶ 8, 12. For example, on July 1, 2020, Delaware announced the relaunch of its pilot accessible absentee voting program for its July 7, 2020 election through Democracy Live, which is the same election systems vendor who currently contracts with New Hampshire. Press Release, Del. Dep't of Elections, Accessible Voting Available for July 7th Presidential Primary (July 1, 2020), https://news.delaware.gov/2020/07/01/accessible-voting-available-for-july-7th-presidential-primary (hereinafter "Press Release"); Ex. 4, Blake Decl. ¶¶ 10–11. This system offers electronic delivery of accessible ballots, a ballot marking tool, and submission by voter choice of mail, fax or email for voters with disabilities. Press Release, *supra*.

For other forms, such as to register and requesting an absentee ballot, Defendants need simply provide the paperwork in accessible, fillable PDFs and allow applicants to use electronic signatures and send the form via email. Making such forms accessible is easily done in Adobe. *See* Ex. 4, Blake Decl. ¶¶ 21–24. Such forms can also be securely signed on the computer. New York, for example, recently entered into a court-ordered stipulation allowing voters to sign their application for an accessible absentee ballot electronically. *Id.* ¶ 25.

## II.     Plaintiffs Are at Imminent Risk of Irreparable Harm.

Absent a preliminary injunction, Plaintiffs are at imminent risk of suffering irreparable harm. "[I]rreparable harm can consist of a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (citation omitted). Plaintiffs must show "a realistic prospect of irreparable harm"—that is, "something more than conjecture, surmise, or a party's

unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

Interference with a person's right to vote is irreparable harm. *See Harman*, 380 U.S. at 537; *Devine v. State of Rhode Island*, 827 F. Supp. 852, 866 & n.1 (D.R.I. 1993) (holding that "create[ing] such confusion as to restrict the voters' right to vote freely for the candidate of their choice" is irreparable harm); *Nat'l Fed'n of the Blind, Inc. v. Lamone*, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014), *aff'd* 813 F.3d 494; *cf. ER Holdings, Inc. v. Norton Co.*, 735 F. Supp. 1094, 1101–02 (D. Mass. 1990) (interference with shareholder vote through delay causes irreparable harm). Absent an injunction, Plaintiffs will be forced either to risk their health and their loved ones' health by voting in person or forfeit their right to vote privately and independently in the upcoming 2020 elections. No other voters in New Hampshire face this choice. Preliminary relief is warranted because the election is just two months away. To ensure that its absentee voting program functions smoothly for voters with disabilities, Defendants must begin immediately to make the process accessible.

### III. Preliminary Injunctive Relief Will Not Harm Defendants but Will Advance the Public Interest by Promoting Voting Rights and Safeguarding Health.

The balance of relative hardships and the effect of an injunction on the public interest—which, in this case against the state government, are considered together—also cut in Plaintiffs' favor. The public interest favors securing and advancing the right to vote. "[V]oting is of the most fundamental significance under our constitutional structure," *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Adopting procedures that will allow voters with disabilities independent and private access to absentee voting will impose little hardship on Defendants. As noted above, the tools needed to make these processes more accessible are inexpensive and can be implemented on relatively short notice. A preliminary injunction also

would enable more citizens to stay at home rather than venture out to vote, promoting the public health in compliance with state and federal guidance.

**IV.     The Court Should Waive Bond.**

Federal Rule of Civil Procedure 65(c)'s bond requirement may be waived "in suits to enforce important federal rights or public interests." *Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982) (citation omitted), *rev'd on other grounds*, 467 U.S. 526 (1984). As this suit is about enforcing the rights of people with disabilities under federal law to exercise the fundamental right to vote, and posting a surety would be a hardship for Plaintiffs, bond should be waived. Ex. 1, Frye Decl. ¶ 21; Ex. 2, Shiner Decl. ¶ 17; Ex. 3, Dickinson Decl. ¶ 18; Ex. 5, Ritcey Decl. ¶ 15.

**CONCLUSION**

For the foregoing reasons, this Court should issue a preliminary injunction requiring Defendants to make New Hampshire's absentee voting program accessible and available to Plaintiffs and other voters with print disabilities for the September 8, 2020 primary election and November 3, 2020 general election and to notify voters of the changes.

Dated: July 7, 2020

Respectfully submitted,

DISABILITY RIGHTS CENTER-
NEW HAMPSHIRE, INC.


By:  /S/ *Pamela E. Phelan*
Pamela E. Phelan (#10089)
Pamelap@drcnh.org
(603) 491-4157 (mobile number)
James Ziegra (#20689)
jamesz@drcnh.org
(603) 661-7314 (mobile number)
64 North Main Street, Ste. 2

15

Concord, NH 03301
(603) 228-0432 (general office number)
(603) 225-2077 (general office fax number)


Gregory P. Care (*pro hac vice* pending)
gpc@browngold.com
(443) 534-5641 (mobile number)
Abigail A. Graber (*pro hac vice* pending)
agraber@browngold.com
(410) 215-0110 (mobile number)
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030 (general office number)
(410) 385-0869 (general office fax number)

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a copy of this Motion and accompanying Affidavit was forwarded by first-class mail and e-mail to Gordon MacDonald, Esq. (Gordon.macdonald@doj.nh.gov), and Anthony Galdieri, Esq. (Anthony.galdieri@doj.nh.gov), at the New Hampshire Attorney General's Office, 33 Capitol Street, Concord, New Hampshire 03301.


Dated:  July 7, 2020          /S/ *Pamela E. Phelan*
                              Pamela E. Phelan