## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

DANIEL FRYE et al.,                              )
                                                 )
                    Plaintiffs,                  )   Case No.: 1:20-cv-00751 SM
                                                 )
        vs.                                      )
                                                 )
WILLIAM M. GARDNER, in his official              )
capacity as the Secretary of State of New        )
Hampshire et al.,                                )
                                                 )
                    Defendants.                  )
                                                 )

## AMENDED COMPLAINT

### INTRODUCTION

1.      Daniel Frye, Mary Jean Shiner, Jeffrey Dickinson, the National Federation of the

Blind, Inc. ("NFB"), the National Federation of the Blind of New Hampshire, Inc. ("NFB-NH"),

and Granite State Independent Living ("GSIL") (collectively "Plaintiffs"), bring this action

against Defendants William M. Gardner, in his official capacity as the Secretary of State of New

Hampshire, and the New Hampshire Department of State under Title II of the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the

Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 *et seq.*

2.      Plaintiffs seek to vindicate the right of individuals with disabilities to register and

vote absentee privately and independently in, and have access to information about, future

elections conducted by Defendants. Federal law guarantees people with disabilities, including

Plaintiffs, an opportunity to access a private, independent absentee vote and information about

elections that is equal to the opportunity voters without disabilities enjoy.

3.      In ordinary times, the rights guaranteed by the ADA and Section 504 are

fundamental to the ability of people with disabilities to live with dignity and independence and to enjoy full integration into their communities. Now, with the COVID-19 pandemic, these rights have, in some cases, become matters of life and death. By seeking accessibility, Plaintiffs seek not only the same convenience others enjoy, but also the means that the state grants voters without disabilities to protect themselves from the pandemic.

4.      In violation of federal law, Defendants have denied Plaintiffs the right to a private and independent absentee vote, and in some cases the right to vote at all. On the basis of these violations, Plaintiffs seek injunctive relief, a declaratory judgment, attorneys' fees and costs, and any other available relief.

5.      Plaintiffs also seek to vindicate the right of people with disabilities to communicate with their government as effectively as people without disabilities do. By constructing and maintaining an inaccessible website and inaccessible PDFs accessed through their website, Defendants have deprived Plaintiffs of equal access to important election information the state makes available to voters without print disabilities.

6.      Under New Hampshire law, people who cannot vote in person because of disability may cast an absentee vote. New Hampshire also allows anyone to absentee vote when they are absent from their district on election day or fear for their safety traveling to the polls due to forecasts of severe weather. As a result of the once-in-a-century impact of the COVID-19 pandemic, for the first time, New Hampshire has, for practical purposes, expanded access to its absentee registration and ballot program to all voters. In the September 8, 2020 state primary election, over 90,000 voters, or about 30% of those who cast a ballot, chose to safely vote via absentee ballot instead of risking their health by voting in person.[1]

---

[1] *2020 State Primary: Ballots Cast*, N.H. Dep't State, https://sos.nh.gov/elections/elections/

7.     On August 28, 2020, the Plaintiffs and Defendants reached an agreement whereby Defendants would contract with the company VotingWorks to implement a remote, accessible vote-by-mail ("RAVBM") system for the September 8, 2020, and November 3, 2020 elections. Generally speaking, RAVBM systems allow voters to receive and mark ballots electronically. If properly implemented, the VotingWorks RAVBM should enable New Hampshire residents who are blind[2] or have other disabilities that interfere with their ability to use a paper ballot (together, "print disabilities") to review and mark their absentee ballots privately and independently, in the comfort and safety of their homes. Defendants also agreed to make certain forms, guidance, and webpages related to voting accessible to persons who are blind or have other print disabilities.

8.     The August 28 agreement expires after the November 3, 2020 election. In future elections, New Hampshire residents who are blind or have other print disabilities will not have the safer option to vote at home and whenever it is convenient to do so. Without the changes required by that agreement, New Hampshire's absentee voting program (including absentee registration, application for an absentee ballot, and the absentee ballots themselves) and important information on the Secretary of State's website will be inaccessible to them. But for the parties' August 28 agreement, New Hampshire's absentee voting program relies on printed forms and ballots that print-disabled voters cannot read or mark independently, and New Hampshire does not offer an accessible, electronic means of obtaining voting information and an absentee ballot, much less accessible, electronic absentee ballot marking. Even for the September 8 and November 3, 2020 elections, New Hampshire did not offer voters with disabilities an

---

election-results/2020/2020-state-primary (last updated Sept. 14, 2020) (click "Ballots Cast" to download spreadsheet "ballotscastsp20").

[2] Throughout this Complaint, the term "blind" is used in its broadest sense to include all persons who, under federal civil rights laws, have a vision-related disability that requires alternative methods to access print.

accessible way to independently and privately return their marked ballots. Other jurisdictions successfully offer print-disabled voters such opportunities, and the technology is presently available to be used in New Hampshire.

9.     The inaccessible absentee ballot system in New Hampshire is part of a long history of discriminatory barriers—from inaccessible polling or voter registration places, to inaccessible voting machines, to the contemptuous attitude of poll workers—that people with disabilities have had to endure.[3]

10.     As a consequence, their voter turnout has been lower than turnout among voters without disabilities.[4] In fact, as voter turnout among people without disabilities soared from 50.1% to 57.2% between the 2014 and 2018 midterm elections, turnout among people with disabilities *dropped* from 50.6% to 46.9%. This does not reflect a lack of interest in voting. Voter turnout has increased substantially across the country in recent years, as states reduce barriers to voting for the disabled. New Hampshire is one of only six states that saw voter participation among people with disabilities drop from 2014 to 2018, and it has the eighth largest gap, as a percentage of voters, between turnout among people with disabilities and those without.[5]

11.     One barrier to voting for people with disabilities is New Hampshire's reliance on exclusively paper forms and ballots for absentee voting, which prevents people who have print disabilities from casting a private vote.

12.     While the COVID-19 pandemic continues, New Hampshire's absentee ballot

---

[3] N.H. Advisory Comm. to the U.S. Comm'n on Civil Rights, *Voting Rights in New Hampshire* 15 (2018), https://www.usccr.gov/pubs/2018/05-16-NH-Voting-Rights.pdf.

[4] Lisa Schur & Douglas Kruse, Rutgers Sch. of Mgmt. & Labor Relations, *Fact Sheet: Disability and Voter Turnout in the 2018 Elections* 7 (2020), https://smlr.rutgers.edu/sites/default/files/2018disabilityturnout.pdf.

[5] *Id.* at 6–7.

system places Plaintiffs in an impossible bind. Plaintiffs must either: a) forfeit their right to vote privately and independently, or b) risk their health and the health of their loved ones by voting in person.

13.     Because eligible individuals without print disabilities may register and vote via New Hampshire's absentee services and access information through the Secretary of State's website privately and independently, the ADA and Section 504 require Defendants to provide individuals with print disabilities—including Plaintiffs—an equal opportunity to do the same.

14.     New Hampshire must implement permanent solutions—an accessible, electronic absentee voting program; a fully accessible website; and policies to maintain its accessibility—so that voters with print disabilities have equal access to vote absentee independently and privately in all elections conducted by Defendants.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' claims arise under the ADA and Section 504. In addition, the Court has jurisdiction over Plaintiffs' claims for declaratory relief pursuant to 28 U.S.C. §§ 2201–02.

16.     Venue is proper in the District of New Hampshire pursuant to 28 U.S.C. § 1391(b)(1), because Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

17.     Plaintiff Daniel Frye is a blind adult who is registered to vote in New Hampshire. Mr. Frye is a member of the National Federation of the Blind of New Hampshire and the

National Federation of the Blind.[6] He resides in Concord, New Hampshire, with his wife, who is immunocompromised. Mr. Frye is a regular voter who voted in the September 8, 2020 primary election and intends to vote in the November 3, 2020 general election and subsequent elections. Mr. Frye prefers to vote absentee at least so long as the risk of COVID-19 remains and intends to continue voting absentee after the pandemic has resolved. Mr. Frye is eligible to vote absentee under RSA 657:1 due to disability, when he is traveling outside his district, and in cases of severe weather even in the absence of the COVID-19 threat.

18.     Plaintiff Mary Jean Shiner is a blind adult who is registered to vote in New Hampshire. She is a member of the National Federation of the Blind of New Hampshire and the National Federation of the Blind. She resides in Exeter, New Hampshire, and is a regular voter who voted in the September 8, 2020 primary election and intends to vote in the November 3, 2020 general election and subsequent elections. Ms. Shiner prefers to vote absentee at least so long as the risk of COVID-19 remains. She also requires the option to vote absentee even in the absence of the pandemic when she is traveling outside of her district, lacks transportation to her polling place, or is experiencing medical issues that limit her mobility (as occurred during the September 8, 2020 election). Ms. Shiner is eligible to vote absentee under RSA 657:1 due to disability, when she is traveling outside her district, and in cases of severe weather even in the absence of the COVID-19 threat.

19.     Plaintiff Jeffrey Dickinson is an adult with a disability who is registered to vote in New Hampshire. He has Becker's Muscular Dystrophy, which causes severe muscle weakness throughout his body and severely limits the use of his arms and hands. He cannot fill out and sign paper forms independently. He is a client of GSIL. Mr. Dickinson resides in Franklin, New

---

[6] Members of state affiliates are automatically members of the National Federation of the Blind.

Hampshire, and is a regular voter who voted in the September 8, 2020 primary election and intends to vote in the November 3, 2020 general election and subsequent elections. He intends to vote absentee in the November 3, 2020 election and intends to vote absentee in subsequent elections due to his disability. Mr. Dickinson is eligible to vote absentee under RSA 657:1 due to disability and in cases of severe weather even in the absence of the COVID-19 threat.

20.     NFB is a 501(c)(3) non-profit corporation comprised of blind individuals and their families and friends. It is a membership organization. The organization promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, employment, family and community life, transportation, recreation, politics, and voting. NFB's goal of complete integration of the blind into society on a basis of equality includes removal of legal, economic, and social discrimination. NFB advances its members' right to participate fully and equally in all aspects of their lives, including by ensuring its blind members can vote on equal footing with sighted individuals. Among other efforts, NFB has worked to ensure that the blind have an equal opportunity to vote on the same terms as other voters by collaborating with developers of voting technology to ensure accessibility for the blind. NFB also advocates in front of state executive and legislative bodies, including in New Hampshire, for improved accessibility in state voting programs. If New Hampshire's absentee voting program were fully accessible, NFB could direct the resources it spends on that matter to other elements of its mission.

21.     Plaintiff NFB-NH is the New Hampshire affiliate of the National Federation of the Blind. NFB-NH is a 501(c)(3) non-profit corporation comprised of blind New Hampshire residents and their families and friends. It is a membership organization. NFB-NH advances its

members' right to participate fully and equally in all aspects of their lives, including by ensuring its blind members can vote on equal footing with every other New Hampshire resident. Among other efforts, NFB-NH has worked to ensure the blind have an equal opportunity to vote on the same terms as other voters by collaborating with developers of voting technology to ensure accessibility for the blind.

22.     NFB and NFB-NH have many blind members, including Mr. Frye and Ms. Shiner, who are eligible to vote in New Hampshire and wish to vote in future elections by casting an absentee ballot privately and independently. Many of NFB and NFB-NH's members are eligible to vote absentee under RSA 657:1 due to disability, travel, and/or in cases of severe weather even in the absence of the COVID-19 threat. NFB and NFB-NH bring this lawsuit on behalf of themselves and on behalf of their members.

23.     Plaintiff GSIL is a 501(c)(3) non-profit corporation and operates as an independent living center serving persons with all kinds of disabilities throughout New Hampshire. Its mission is to enhance opportunities for all people with disabilities to direct their own lives. Among its other projects, GSIL has devoted resources to advocating with the executive and legislative branches of state government to improve accessibility in New Hampshire's voting programs. If New Hampshire's absentee voting program were fully accessible, GSIL could devote those resources to other elements of its mission. GSIL has numerous clients, including Mr. Dickinson, who are eligible to vote in New Hampshire and wish to participate in New Hampshire's absentee voting program in future elections but have print disabilities and therefore cannot do so on an equal and independent basis. Many of GSIL's clients are eligible to vote absentee under RSA 657:1 due to disability, travel, and/or in cases of severe weather even in the absence of the COVID-19 threat. GSIL's clients are qualified

individuals with disabilities within the meaning of all applicable statutes. GSIL brings this lawsuit on behalf of itself and on behalf of its clients.

24.     Defendant Gardner is the Secretary of State of New Hampshire and, in that position, leads the Department of State. Defendant Gardner supervises and administers New Hampshire's elections, including the absentee voting program and the voting-related website. He is sued in his official capacity only.

25.     Defendant Department of State is the executive department within the New Hampshire state government tasked with supervising and administering elections within the state.

## FACTUAL ALLEGATIONS

### COVID-19's Effect on New Hampshire's Upcoming Elections

26.     Nationwide, as of October 6, 2020, there have been 7,436,278 total cases of COVID-19, and 209,560 deaths, according to the Centers for Disease Control and Prevention ("CDC").[7] In New Hampshire, as of October 6, 2020, there have been 8,645 total cases of COVID-19 and 443 deaths.[8]

27.     Adults with disabilities are three times more likely than adults without disabilities to have serious underlying medical conditions that place them at a higher risk of severe illness from COVID-19.[9]

---

[7] *Coronavirus Disease 2019 (COVID-19): United States COVID-19 Cases and Deaths by State,*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Oct. 6, 2020).

[8] *COVID-19 Summary Dashboard*, N.H. Dep't of Health & Human Servs., https://www.nh.gov/covid19/dashboard/summary.htm (last visited Oct. 6, 2020).

[9] *See Coronavirus Disease 2019 (COVID-19): People with Disabilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last visited Sept. 15, 2020).

28.     No cure or vaccine for COVID-19 exists. Once a vaccine is approved, there are significant logistical challenges to distributing it to a critical mass of the population to create herd immunity. The United States does not yet have a plan for distribution. As a result, even if a vaccine is approved by January 2021—which is by no means certain—scientists expect the risk of COVID-19 infection to continue for an unknown amount of time after.[10]

29.     To inhibit the spread of COVID-19, the CDC has encouraged people to use an absentee ballot rather than voting in person.[11]

30.     Technology is readily available that would afford Plaintiffs, and other voters who have print disabilities, the opportunity to cast their votes through absentee ballots privately and independently—as sighted individuals may do. But Defendants have not committed to make this technology available to Plaintiffs after the November 3, 2020 election.

31.     New Hampshire first declared a state of emergency due to COVID-19 on March 13, 2020,[12] and has continuously renewed the state of emergency (nine times) since then, with the current extension through October 9, 2020.[13]

32.     The Select Committee on 2020 Emergency Election Support ("Select Committee") appointed by Secretary Gardner advised that the safety of the upcoming elections is

---

[10] Maggie Fox, *Here's Why a Vaccine Will Not Stop the Covid-19 Pandemic Right Away*, CNN (Sept. 15, 2020), https://www.cnn.com/2020/09/15/health/vaccine-not-end-coronavirus-pandemic/index.html.

[11] *See Coronavirus Disease 2019 (COVID-19): Considerations for Election Polling Locations and Voters*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last visited Oct. 6, 2020).

[12] Executive Order 2020-04, N.H. Office of the Governor, https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/2020-04.pdf.

[13] Executive Order 2020-18, N.H. Office of the Governor, https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/2020-18.pdf.

"highly dependent on a robust use of absentee registration and voting"[14] and that the state must "encourage absentee balloting in greater numbers, thus allowing for a safer environment on election day at the polls."[15]

33.     New Hampshire law allows only certain people to vote absentee, including people "who [are] unable to vote . . . in person by reason of physical disability."[16] Secretary Gardner and Attorney General Gordon MacDonald have issued guidance clarifying that, due to COVID-19 "*all voters* have a reasonable ground to conclude that a 'physical disability' exists within the meaning of RSA 657:1. Therefore, *all voters may request an absentee ballot on that basis*."[17]

34.     Approximately 30% of voters voted absentee in the September 8 election.[18] Historically, only about 5% of voters have voted absentee.[19]

35.     The dangers posed by in-person voting are real. Wisconsin officials reported that at least 40 people in Milwaukee may have contracted COVID-19 due to in-person participation in that state's April 7, 2020 primary election.[20]

36.     Blind people, including Plaintiffs, face higher risks voting in person, because it is more difficult for them to ensure they remain six feet apart from other individuals, as is

---

[14] *Report of the Select Committee on 2020 Emergency Election Support* 8 (2020), https://sos.nh.gov/media/ovzhr1r4/final-report.pdf (hereinafter "*Select Committee Rpt.*").

[15] *Id.* at 12.

[16] RSA 657:1(I).

[17] Mem. from William M. Gardner, Sec'y of State, & Gordon J. MacDonald, Att'y Gen., to N.H. Election Officials 1 (April 10, 2020), https://www.nhpr.org/sites/nhpr/files/202004/covid-19_elections_guidance.pdf.

[18] *See supra* n.1.

[19] *Select Committee Rpt.*, *supra* n.14, at 9.

[20] Teran Powell, *40 Coronavirus Cases in Milwaukee County Linked to Wisconsin Election, Health Official Says*, WUWM 89.7 (Apr. 24, 2020), https://www.wuwm.com/post/40-coronavirus-cases-milwaukee-county-linked-wisconsin-election-health-official-says#stream/0.

recommended by the CDC to stem the spread of COVID-19. Not only can blind people often not

see others around them, but blind people often come into unwanted physical contact with others,

because they are frequently grabbed by misguided individuals seeking to "help" them.

37.     The journey to a polling place also is more hazardous for blind individuals,

including Plaintiffs, than it is for sighted individuals. Because blind individuals cannot drive,

they disproportionately rely on public transportation services, which necessarily bring them into

close proximity with others. Even an ideal in-person voting experience therefore entails risks.

Blind individuals also periodically find themselves without a means of transportation.

**Plaintiff Daniel Frye**

38.     Daniel Frye is legally blind and lives in Concord, New Hampshire, with his wife,

who is also legally blind and immunocompromised.

39.     Mr. Frye is a registered voter and has regularly voted in past New Hampshire

elections.

40.     Because of the COVID-19 pandemic and his wife's heightened susceptibility to

COVID-19, Mr. Frye does not feel safe voting in person. He did not vote in person for the

September 8, 2020 primary election, and he does not intend to vote in person for the November

3, 2020 general election or for any future election while COVID-19 remains a threat.

41.     Mr. Frye is concerned about the sterility of voting in person. He will not be able

to confirm independently (without touching or reaching out for others) that other individuals will

wear gloves or face masks in order to help prevent the spread of the COVID-19 virus. If he were

to vote in person, he could not determine whether the people surrounding him were maintaining

adequate "social distancing." He has often been grabbed by strangers who assume he needs help

when he does not.

42.     Mr. Frye intends to vote absentee in future elections after the pandemic has resolved. He has voted absentee in the past due to travel on election day. Because of his disability, he does not drive, and he has had trouble in the past accessing transportation. He will also vote absentee if he cannot find transportation to the polls.

43.     Voting independently and privately is important to Mr. Frye. He intends to apply for an absentee ballot in future elections if the process is accessible.

44.     After November 3, 2020, Mr. Frye will be unable to independently apply for an absentee ballot or vote independently and privately using an absentee ballot, because Defendants have not made the process accessible to voters with print disabilities.

**Plaintiff Mary Jean Shiner**

45.     Mary Jean Shiner lives in Exeter, New Hampshire, with her husband. Ms. Shiner is legally blind.

46.     Ms. Shiner is a registered voter who has regularly voted in past New Hampshire elections, typically in person using the accessible one4all ballot marking machine.

47.     Because of the COVID-19 pandemic, Ms. Shiner does not feel safe voting in person. She did not vote in person for the September 8, 2020 primary election, and she does not intend to vote in person for November 3, 2020 general election or for any future election while COVID-19 remains a threat.

48.     Ms. Shiner is concerned about the sterility of in-person voting. She will not be able to confirm that other individuals will wear gloves or face masks to help prevent the spread of the COVID-19 virus. If she were to vote in person, she could not determine whether the people surrounding her were maintaining adequate "social distancing." She also has concerns about using the one4all machine because it is usually set up in a closely confined area that makes

social distancing impossible, and she would have to use the keyboard without gloves to feel the appropriate keys to mark the ballot.

49.     Voting independently and privately is important to Ms. Shiner. She intends to apply for an absentee ballot in future elections at least so long as the risk of COVID-19 remains if the process is accessible, and she wishes to have the option to vote absentee after the pandemic due to travel outside of the district, lack of transportation to her polling place, or due to medical issues that limit her mobility, as occurred during the September 8, 2020 election.

50.     After November 3, 2020, Ms. Shiner will be unable to apply for an absentee ballot or vote independently and privately using an absentee ballot, because Defendants have not made the process accessible to voters with print disabilities.

**Plaintiff Jeffrey Dickinson**

51.     Jeffrey Dickinson lives in Franklin, New Hampshire. Mr. Dickinson is GSIL's Advocacy Director and a client of GSIL.

52.     Mr. Dickinson has Becker's Muscular Dystrophy, which causes severe muscle weakness throughout his body. It is a progressive condition that leaves him with extremely limited use of his arms and hands. Writing on and signing his name to documents is difficult or impossible.

53.     Mr. Dickinson is a registered voter who has regularly voted in past New Hampshire elections.

54.     Because of the COVID-19 pandemic, Mr. Dickinson does not feel safe voting in person. He did not vote in person for the September 8, 2020 primary election, and he does not intend to vote in person for the November 3, 2020 general election or for any future election while COVID-19 remains a threat. His disability has progressed to the point that travel outside

his home is increasingly difficult and will only become more so. He anticipates that after the pandemic he will have to vote absentee in most, if not all, future elections.

55.     Mr. Dickinson is concerned about the sterility of in-person voting. Muscular Dystrophy frequently impacts breathing. In 2014, he suffered nearly fatal respiratory failure which resulted in a month-long hospital stay and placement of a tracheostomy. His diminished breathing capacity and tracheostomy make him very susceptible to any kind of respiratory infection such as COVID-19. He is also concerned about passing COVID-19 onto his caregivers, two of whom are at heightened risk, and his elderly parents who visit him every Sunday.

56.     Voting independently and privately is important to Mr. Dickinson. He typically asks his personal care attendants to fill out and sign forms for him. He is concerned about disclosing his voting choices and the effect doing so may have on his relationships with caregivers who may disagree with him. He intends to apply for an absentee ballot in future elections while COVID-19 remains a risk if the process is accessible.

57.     After November 3, 2020, Mr. Dickinson will be unable to apply for an absentee ballot or vote independently and privately using an absentee ballot, because Defendants have not made the process accessible to voters with print disabilities.

**The Absentee Voting Program in New Hampshire**

58.     Ordinarily, New Hampshire voters may vote absentee if they will be absent from the place in which they are registered to vote on election day (including if they cannot go to their polling place for work reasons or because of caregiving obligations); if they cannot appear in public for religious reasons; if they cannot vote in person because of disability; or if the National Weather Service has issued a winter storm warning, blizzard warning, or ice storm warning for

election day applicable to their locality.[21] Because of the pandemic, for the first time, all voters in New Hampshire have grounds to vote absentee.

59.     To receive an absentee ballot, an individual must first register to vote.

60.     To register to vote, an individual must ordinarily apply in person to his or her town or city clerk's office.[22] Individuals must provide proof of identity, age, citizenship, and domicile, either by documents or by signing a Qualified Voter Affidavit under oath in front of an election official.[23] Only voters who are temporarily absent from their town or city of residence or "who by reason of physical disability [are] unable to attend a meeting of the supervisors of the checklist" may register absentee, which requires the voter to include an absentee registration affidavit along with the voter registration form in the packet sent to the city or town clerk.[24]

61.     Secretary Gardner and Attorney General MacDonald have issued guidance clarifying that, due to COVID-19, "*all voter registration applicants* have a reasonable basis to conclude that a 'physical disability' exists within the meaning of RSA 654:16 and 654:17. . . . Therefore, *all applicants may request an absentee voter registration package by mail, e-mail, fax, or phone on that basis*."[25]

62.     To receive an absentee ballot, an individual completes and signs an absentee ballot application and submits it to the clerk of the town or city in which he or she desires to

---

[21] RSA 657:1.

[22] RSA 654:8, 654:12. New Hampshire also allows same-day voter registration at polling places on election day. RSA 654:7-a.

[23] RSA:12.

[24] RSA 654:16–19.

[25] Mem. from William M. Gardner, Sec'y of State, & Gordon J. MacDonald, Att'y Gen., to N.H. Election Officials 1 (June 3, 2020), https://sos.nh.gov/media/x2hdkfp4/joint-guidance-voter-registration-june-3-2020.pdf (hereinafter "Voter Registration Guidance").

vote.[26]

63.     New Hampshire allows voters request an absentee voter registration packet and/or absentee ballot up until the day before the election.[27]

64.     "Upon receipt of a properly executed application for an official absentee ballot," the clerk verifies that the voter is on the local rolls and, if so, sends the voter a paper absentee ballot, an envelope on which is written an affidavit attesting to the reason the voter needed to vote absentee, and a return envelope.[28] The law allows New Hampshire officials to send the absentee ballot materials by mail or hand delivery. Voters living overseas may receive the ballot via email.[29]

65.     The voter must fill out the absentee ballot, place the ballot in the inner envelope, and execute the affidavit. The voter then places the ballot envelope in the return envelope, "endorse[s]" his or her name, address, and voting place, and returns the ballot to the city or town clerk by hand delivery or mail. Absentee ballots must be received by the clerk by 5:00 p.m. on the day of the election.[30]

66.     For New Hampshire voters residing in the United States, there is no option planned after the November 3, 2020 election for registering to vote absentee or requesting, receiving, marking, or submitting an absentee ballot electronically. All absentee ballots will have to be marked by hand and delivered in hard copy.

---

[26] RSA 657:6. A person can also apply for an absentee ballot by sending the clerk "a written statement containing the information required by RSA 657:4"—i.e., the information solicited on the absentee ballot application, presumably including the same signature requirements. *Id.*

[27] Voter Registration Guidance, *supra* n.26, at 3.

[28] RSA 657:12–13.

[29] RSA 657:15(I).

[30] RSA 657:17.

**New Hampshire's Absentee Voting Program Is Inaccessible**

67.     New Hampshire contracted with VotingWorks for only the September 8 and November 3, 2020 elections. While the contract contemplates that the parties will "consider extending or reviewing this agreement," it also warns that "any extension will require a different funding source and . . . the State has no obligation to identify such funding."

68.     After November 3, 2020, every step of New Hampshire's absentee voting program will again be inaccessible. In other words, voters with print disabilities will not be able to participate in this program without depending on others for help, sacrificing their independence and their privacy.

69.     Prior to the August 28 agreement between the parties, the form affidavit for voters registering absentee because of physical disability was not accessible—*i.e.*, it was not available as an electronic fillable form that could be read and completed by a blind or print-disabled person using assistive technology, and it had to be signed by hand.[31]

70.     The voter registration form is not available online and, prior to the August 28 agreement, had to be requested in hard copy from the resident's town or city clerk.

71.     Prior to the August 28 agreement, absentee registration materials had to be sent to the clerk in hard copy.

72.     While the Application for State Election Absentee Ballot is available as an electronic fillable form, prior to the August 28 agreement, it had to be printed and signed by hand.[32] People who are blind cannot locate the place for signature without assistance, and people

---

[31] N.H., *Absentee Voter Registration Form – Physically Disabled*, https://sos.nh.gov/media/ 5kio3wfw/absentee-voter-registration-disabiity-or-covid.pdf. Although this document is entitled "Absentee Voter Registration Form," it is in fact only the accompanying affidavit.

[32] N.H., *Application for State Election Absentee Ballot-RSA 657:4*, https://sos.nh.gov/media/ 4padcskb/absentee-ballot-app-8-20-covid-fill-in.pdf.

with print disabilities generally cannot sign without assistance.

73.     The Application for State Election Absentee Ballot requires voters requesting a ballot for the primary election to reveal their party affiliation. Thus, a voter will not be able to keep this information private from the person assisting them.

74.     Under the August 28 agreement, voters with print disabilities may fill out an application for an absentee ballot on their computers using a fillable form and email the request to their town or city clerk. The clerk will send the voter accessible absentee registration forms if the voter is not registered.

75.     While New Hampshire currently has an electronic, fillable form to allow voters with print disabilities to request absentee registration documents to be sent to them electronically and to request an accessible absentee ballot, that form is for use only in the September 8 and November 3, 2020 elections.[33]

76.     Even for the 2020 elections, this process continues to be inaccessible. Plaintiffs cannot independently look up the contact information for their local clerk because, as described below, that part of Defendants' website is inaccessible.

77.     In elections not covered by the August 28 agreement, absentee ballots themselves are transmitted, marked, and returned entirely on paper. This process requires the voter to:

A.     Read the ballot in hard copy and fill it out by hand;

B.     Place the completed ballot inside the secrecy envelope, locate the place for signature, and sign the attestation;

C.     Seal the secrecy envelope and place it inside the return envelope, locate the place for the voter's name, address, and polling place, and endorse the same.

---

[33] N.H., *Certification and Application for an Accessible State Election Electronic Absentee Ballot*, https://sos.nh.gov/media/4yqptp4l/application-for-an-accessible-electronic-absentee-ballotv4-09022020.pdf.

78.     Blind people cannot locate the correct places to mark their ballots or envelopes without assistance, and voters with print disabilities generally cannot mark their ballots or complete the affidavit or mailing information without assistance. Thus, a voter will not be able to keep this information, including their vote, private from the person assisting them.

79.     Many print-disabled individuals, including members of NFB, NFB-NH, and clients of GSIL, do not have assistance in their homes to complete paper absentee ballots and, even if assistance is available, print-disabled voters sacrifice their privacy and independence by having to rely on that assistance.

80.     The result is that, while non-print disabled individuals who are eligible to vote absentee may do so vote independently and privately, individuals with print disabilities cannot.

81.     While New Hampshire contracted for an accessible electronic ballot delivery and ballot marking system for the September 8 and November 3, 2020 elections, it did not allow electronic ballot return. As a result, to use the system, voters with disabilities had to be able to print their ballots.

82.     New Hampshire has no intention of allowing electronic ballot return for voters with print disabilities in future elections.

83.     Many people with print disabilities, including members of NFB, NFB-NH, and clients of GSIL, struggle to independently use the mail. Mr. Dickinson, for example, does not have the manual dexterity to handle his own mail.

84.     Many print-disabled voters, including members of NFB, NFB-NH, and clients of GSIL, do not have access to printers at home. Voters without disabilities who are eligible to vote absentee do not need a printer to exercise their right to vote absentee.

85.     Many print-disabled voters, including members of NFB, NFB-NH, and clients of

GSIL, do not have reliable access to transportation. Ms. Shiner, Mr. Frye, and Mr. Dickinson at times lack access to transportation because they cannot drive themselves due to their disabilities. Absentee voters in New Hampshire can vote at the last minute on Election Day and still ensure that their ballots are received by the 5:00 p.m. deadline by taking the ballot directly the clerk. For the previously stated reasons, print-disabled voters are not guaranteed that option.

86.     Without electronic return, many voters with print disabilities will not be able to vote absentee with the flexibility, ease, privacy, and independence voters without disabilities enjoy.

87.     New Hampshire recognizes that its absentee voting program is inaccessible to blind individuals. The solution New Hampshire contemplates is for someone to assist blind voters, not to provide an accessible absentee voting program.[34]

88.     By forcing Plaintiffs and other individuals with print disabilities to seek out third-party assistance, the absentee voting program jeopardizes their safety during the COVID-19 pandemic. In ordinary times, it deprives them of the convenience others who are also eligible to vote absentee enjoy, including the ability to vote from their home, independently and privately, at the time of their choosing.

89.     Plaintiffs are entitled to equal access to New Hampshire's absentee voting program to vote privately, secretly, independently, and safely, as individuals without print disabilities can.

### Use of the Internet by Individuals with Print Disabilities

90.     For print disabled persons and non-print disabled persons alike, the Internet is a significant source of information and education. Internet websites offer a wealth of information

---

[34] RSA 657:7.

and services with instant availability at any time of day and without the need to travel to engage in these activities.

91.     Those with print disabilities access the Internet from personal computers or mobile devices with assistive technology that accommodates their disabilities. Many types of such technology require the user to navigate without a mouse, such as by using a keyboard. Blind people, for example, use screen readers, which allow them to tab through elements on a page and open them using keyboard commands, while the screen reader vocalizes information presented visually on a computer screen or displays that information on a refreshable braille display. Assistive technology provides the only method by which all print disabled persons can independently access the Internet and associated computer programs. When Internet applications and software are not designed to be compatible with screen-reading software and other assistive technology, print-disabled persons are unable to fully access the information and services they offer.

92.     The Web Accessibility Initiative, a project of the World Wide Web Consortium, the leading standards organization for the Internet, has had in place for many years well-established guidelines for making information on the Internet accessible. These guidelines have been followed successfully by businesses and governments in making their online goods and services accessible to those with print disabilities. The most widely employed version of these guidelines, in effect since 2008, is the Web Content Accessibility Guidelines 2.0, Conformance Level AA (hereinafter, "WCAG 2.0 AA").[35]

---

[35] W3C, *Web Content Accessibility Guidelines (WCAG) 2.0*, https://www.w3.org/TR/WCAG20 (last visited Oct. 5, 2020).

**Portions of Defendants' Website Related to Voting Are Inaccessible**

93.     Defendants maintain a website located at https://sos.nh.gov. Substantial portions of this website offer New Hampshire residents extensive information about voting procedures and policies, candidates, election results and data, and upcoming elections. The website includes functions for voters to look up information specific to them, such as their town or county clerk, registration, polling place, and absentee ballot status. The website also provides voters access to a number of forms, including many of the forms described above to register and vote absentee.

94.     On information and belief, Defendants revamped their website and launched the new version on August 6, 2020. On information and belief, Defendants did not seek to revamp their website out of concern for accessibility issues and did not focus on accessibility issues until Plaintiffs raised them.

95.     Although the voter services website provides residents without print disabilities convenient access to valuable information and critical forms, even after the launch of the new website portions of it are designed and maintained in a manner that deprives print-disabled individuals of these same important services and benefits, because they do not work with assistive technology, such as screen reader software as evidenced in part by numerous instances of noncompliance with WCAG 2.0 AA.

96.     By maintaining an inaccessible website, Defendants make it significantly more burdensome for print-disabled New Hampshire residents to register to vote, gain critical information about voting, and complete and submit forms necessary to exercise their right to vote.

97.     Many of the problems with the website relate to "focus."  As noted above, many print-disabled computer users navigate by tabbing through elements on a screen and using their

23

keyboard to activate links. When the user tabs to an element, if the website is working properly, that element has "focus." Sighted users (including people who are not using assistive technology) should be able to see which element has focus—a box may appear around it, for example. In Image 1, the main link in the upper left corner to the "New Hampshire Department of State" webpage has focus, indicated by the black box around it.

**Image 1**



98.     For assistive technology users, the tab-order that elements gain focus should be logical, so that they can understand the document with the clarity and ease sighted users can.

99.     Some accessibility barriers completely bar access. Others can be overcome with enough time and skill. However, assistive technology users often experience the cumulative effect of many poorly designed features which, when taken together, make a website too frustrating and exhausting to navigate. Defendants' website contains accessibility problems that both outright bar access and, cumulatively, make access much more difficult for users with

disabilities than those without.

100.    Issues with focus make navigating from Defendants' homepage,

https://sos.nh.gov, to any information accessed through the "Elections" menu difficult to

impossible for people with print disabilities if their screen resolution or browser size is set such

that the main menu is collapsed—as it is in Image 1, above. (The three lines in the upper right-

hand corner are the link to the main menu.) Blind users in particular frequently do not keep their

screen resolution or browser size in the typical settings that sighted readers use because they do

not rely on visual cues to navigate. When the user tabs to the link to the main menu and activates

that link, their next tab does not take them to the first item in the menu: "Administration." (See

Image 2, below.) Instead, they must tab through the rest of the webpage before returning to the

menu. As a practical matter, many, if not most, users will not understand this layout and will

never get to the menu contents.

**Image 2**



101.    Once they have reached the menu, when the user places focus on the first sub-menu trigger ("Administration"), that sub-menu opens automatically. There is no way for keyboard users to go back to the previous menu, or to open any further sub-menus.

102.    Even if they could open other sub-menus, such as "Elections," all of the links within each menu are hidden. There is no visual indication of keyboard focus, and there is no way for sighted keyboard users, like Mr. Dickinson, to see individual links.

103.    For blind readers, the arrows that tell the user to click to expand the menu are essentially invisible. They are announced by screen readers as "Toggle Button," which does not convey their function. Since they are described as buttons, users will expect to be able to activate them using the space bar, which does not work.

104.    Under these circumstances, it is essentially impossible for keyboard users, and others whose assistive technology works similarly, to locate the "Elections" link or the "Voting with Disabilities" link within the "Elections" menu.

105.    None of the functions of the website that allow voters to look up information specific to themselves, including their party registration (https://app.sos.nh.gov/Public/PartyInfo.aspx), polling place and sample ballots (https://app.sos.nh.gov/Public/PollingPlaceSearch.aspx), clerk contact information (https://app.sos.nh.gov/Public/ClerkDetails.aspx), and the status of their absentee ballots (https://app.sos.nh.gov/Public/AbsenteeBallot.aspx), are accessible to blind screen-reader users. Blind voters cannot look up any of this information because they cannot get past these webpages' security function (known as a CAPTCHA, or Completely Automated Public Turing test to tell Computers and Humans Apart), which requires sight to enter a series of randomly generated characters displayed on the screen. There are accessible CAPTCHA options available,

but Defendants have not used them. See Image 3 below, showing CAPTCHA code CZE9A.

**Image 3**



106.    Additionally, various input fields ("First Name," "Last Name," etc.) on these pages are not announced, making it difficult for the blind user to determine what they are for. Low-vision voters will struggle with the color contrast on these webpages.

107.    Many of Defendants' election-related webpages begin with a block of text, followed by several boxes in which readers are invited to "learn more" about a subject. (See Image 4). Each link is labeled "learn more," and blind readers will not be able to easily see the visual association between the link and the subject matter. This will require them to do extra work to figure out which link to click on.

**Image 4**



108.    There are significant accessibility problems with many of the PDFs linked to through Defendants' website. Many contain no heading structure that can be read by a screen-reader. Just as sighted users use headings, headings provide important wayfinding points for assistive technology users and help to provide context for the content that follows them. When headings do not adequately and uniquely describe the content that follows them, it makes it more difficult for such users to understand and navigate the content.

109.    Other documents lack tagging. Tags tell blind users what kind of feature each element is—for example, they tell the user if an element is a paragraph, a bulleted list, or an image. Untagged documents can be difficult to incomprehensible to a screen-reader user.

110.    Some of the PDFs include tables with unlabeled headers, or that do not contain the same number of rows in each column or column in each row. Screen-reader users will find this information difficult to impossible to parse.

111.    These are examples of accessibility problems with Defendants' website. This list

is not fully inclusive of all the barriers disabled users face.

112.     When Mr. Frye attempted to use Defendants' website to look up election related information, he encountered significant barriers. He was unable to locate or use the menu from the homepage, https://sos.nh.gov, which is the portal to many of the election-related portions of the website. As a result, he could not navigate to the page on "Voting with Disabilities." He could not look up his clerk, absentee ballot, or party membership status, because he could not get past the security features. He also found the party membership page confusing because it asked for his town with no other context; he did not see an option to put in his name until he had selected his town.

113.     Ms. Shiner also could not access the main menu on the homepage. She, too, tried to look up information personal to her, including her clerk and party membership, but was blocked by the security code. She was able to access information about upcoming elections for 2021 only with significant effort that is not required of non-disabled persons.

114.     Websites are dynamic. They are frequently updated. Any changes can render a once-accessible website inaccessible. To successfully maintain an accessible website, administrators must develop and effectuate policies requiring accessibility to be considered and built in during future updates and changes to the website.

115.     The accessibility barriers on Defendants' website, even after the public release of a purportedly accessible version that Defendants claim was in process since 2018, Scanlan Decl. ¶ 62, ECF No. 23-2, demonstrate that Defendants have failed to establish/effectuate the protocols necessary to comply with the ADA and Section 504.

**New Hampshire Can Make Its Absentee Voting Program Accessible**

116.     Technology is available and in use across the country that allows voters with

disabilities to register to vote and request, receive, fill out, and even return their absentee ballots electronically.

117.    Several third-party vendors provide online or electronic ballot marking systems. These include Prime III, Democracy Live, Five Cedars, Dominion Voting, and VotingWorks. Maryland has designed and implemented its own online ballot marking system.

118.    Maryland makes its ballot marking software available to other states for free. Prime III is also available free of charge.

119.    For forms (other than the ballot) related to the absentee voting program, Defendants need simply provide accessible HTML forms or accessible, fillable PDFs and allow applicants to use electronic signatures and submit the forms over the Internet or via email. Making PDFs accessible is easily done in Adobe. Technology for secure electronic signatures is in widespread use.

120.    Defendants have already shown that accessible absentee voter registration and ballot delivery and marking can be reasonably implemented in New Hampshire. In response to this lawsuit, New Hampshire provided accessible, fillable PDF voter registration and absentee ballot request forms for the September 8, 2020 primary election and will do so for the November 3, 2020 election.

121.    In response to this lawsuit, New Hampshire allowed voters with print disabilities to electronically receive and electronically mark their ballots through the VotingWorks RAVBM for the September 8, 2020 primary and will do so for the November 3, 2020 election.

122.    Several states have recently changed their absentee ballot procedures to make them more accessible to print-disabled voters. Some of those changes have come voluntarily, others in response to court orders.

123.    In September 2020, a federal court in North Carolina ordered the state to allow electronic ballot delivery, marking, and return for voters with disabilities.[36]

124.    In August 2020, Maine agreed to allow voters with disabilities to electronically receive, mark, and return their ballots.[37]

125.    In May 2020, Michigan voluntarily entered into a consent decree requiring it to "acquire a remote accessible vote-by-mail system ('RAVBM') that shall allow voters with print disabilities to review and mark vote-by-mail ballots electronically, privately and independently" in time for its August 2020 election.[38]

126.    On July 1, 2020, Delaware announced the relaunch of its pilot accessible absentee voting program through Democracy Live for its July 7, 2020 election. New Hampshire contracts with Democracy Live for its election systems. The Delaware program offers electronic delivery of accessible absentee ballots, a ballot marking tool, and submission by voter choice of mail, fax, or email for military and overseas voters as well as voters with disabilities.[39]

127.    As of September 2019, nearly half of states allowed electronic return of ballots in at least some circumstances.[40]

128.    New Hampshire's election-related websites can be made fully accessible by

---

[36] *Taliaferro v. N.C. State Bd. of Elections*, No. 5:20-CV-411-BO, 2020 WL 5709252, at *5 (E.D.N.C. Sept. 24, 2020).

[37] Ex. 1, Joint Status Report, *Merrill v. Dunlap*, No. 1:20-cv-00248-JAW (D. Me. Aug. 14, 2020).

[38] Ex. 2, Consent Decree, *Powell v. Benson*, Case No. 2:20-cv-11023-GAD-MJH (E.D. Mich. May 19, 2020), ECF No. 31.

[39] Press Release, Del. Dep't of Elections, Accessible Voting Available for July 7th Presidential Primary (July 1, 2020), https://news.delaware.gov/2020/07/01/accessible-voting-available-for-july-7th-presidential-primary.

[40] *Electronic Transmission of Ballots*, Nat'l Conference of State Legislatures, https://www.ncsl.org/research/elections-and-campaigns/internet-voting.aspx (last visited June 19, 2020).

complying with WCAG 2.0 AA.

129.    According to public records, New Hampshire has a very significant pool of

unused federal funds earmarked for making elections accessible and secure, which could and

should be used to resolve this issue. Between three different federal disbursements to the state

pursuant to the Help America Vote Act, 52 U.S.C. 20901 *et seq* ("HAVA"), in excess of $6

million is presently available to New Hampshire.[41] In addition, New Hampshire received $3.2

million pursuant to the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-

136 (2020) ("CARES Act"), in 2020.[42]

### Plaintiffs Gave Defendants Notice of the Accessibility Barriers in New Hampshire's Absentee Voting Program

130.    Defendants have been told—on many occasions—that the failure to make New

Hampshire's absentee voting program accessible to blind and other print disabled individuals

violates the ADA and Section 504. Defendants took no action on this issue until the threat of

litigation was imminent.

131.    In a September 27, 2019 letter to Defendant Gardner advocating for an accessible

absentee voting program, NFB President Mark A. Riccobono noted that "providing only a paper

absentee ballot that was inaccessible" denies blind individuals their right to vote independently

and privately and violates federal laws. NFB provided information about several remote,

accessible vote-by-mail vendors that could provide accessible absentee voting solutions.

Defendants took no action in response to this letter.

132.    On May 13, 2020, attorney James Ziegra from Disability Rights Center – New

---

[41] U.S. Election Assistance Comm'n, *Grant Expenditure Report: Fiscal Year 2018*, at 4, 6 (2019), https://www.eac.gov/sites/default/files/eac_assets/1/6/FY2018HAVAGrantsExpenditureReport.pdf.

[42] *Select Committee Rpt.*, *supra* n.14, at 1.

Hampshire ("DRCNH") testified before the Select Committee on 2020 Emergency Election Support. Mr. Ziegra explained that New Hampshire's absentee voting program was inaccessible to voters with print disabilities and that it could be made accessible by allowing voters to request an absentee ballot online or over email and by use of electronic ballot marking.

133.     Plaintiff Frye also testified at the May 13 meeting on behalf of the New Hampshire Coalition of Blind and Vision Impaired Voters, emphasizing that absentee voting was inaccessible for voters with print disabilities.

134.     Following this meeting, Defendant took no action to investigate or improve the accessibility of absentee voting in New Hampshire.

135.     On June 15, 2020, DRCNH met with David Scanlan, Orville Fitch, and Patricia Piecuch from the Secretary of State's office to discuss the state's willingness to ensure the accessibility of its absentee voting program consistent with the ADA, Section 504, and the New Hampshire Constitution. Defendants' representatives acknowledged to DRCNH that they had not previously given much thought to making absentee voting accessible. They stated that, although they were monitoring efforts by some vendors, such as Democracy Live, to provide accessible, electronic absentee voting options, they had security concerns regarding the same based on a recent email they had received. The officials were unwilling to commit to any plan to make absentee voting accessible and did not say that they had made any effort to investigate these security concerns, or possible solutions.

136.     On June 19, 2020, DRCNH and Plaintiffs NFB and NFB-NH sent a letter to Secretary Gardner explaining the accessibility barriers in the absentee voting program, suggesting solutions, and warning of the possibility of litigation if New Hampshire did not address these issues promptly.

137.    Plaintiffs negotiated with Defendants for over two weeks in an attempt to resolve this matter without litigation. Defendants refused to commit to implementing accessible absentee registration, making their website accessible, or implementing a remote, accessible vote-by-mail system. Instead, they sketched (but also did not commit to) a partial solution—nowhere near fully formulated—that presented a high likelihood of failure and would not provide voters with print disabilities the ability to vote absentee with the same ease of access voters without disabilities enjoy.

138.    The NFB and NFB-NH conferred with the State on June 26, 2020, but the parties were unable to reach a resolution. Defendants agreed only to begin to look into Plaintiffs' proposed solutions, even though the same solutions had been raised in NFB's September 2019 letter.

139.    Other disability rights advocates also have explained the accessibility problems—and violations of federal law—outlined in this Amended Complaint to Defendants.

140.    To date, Defendants have not committed to making New Hampshire's absentee voting program fully and permanently accessible to print-disabled individuals, including Plaintiffs, who wish to exercise their right to vote absentee in future elections, but do not wish to risk their health, privacy, or independence to do so.

### COUNT I
### Violation of Title II of the Americans with Disabilities Act
### 42 U.S.C. §§ 12131–12134

141.    Plaintiffs incorporate the allegations in the preceding paragraphs, as if alleged herein.

142.    Title II of the ADA guarantees qualified individuals an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132.

143.    Title II mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.*

144.    In providing aids, benefits, or services, public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may public entities provide qualified individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others. 28 C.F.R. § 35.130(b)(1)(ii)–(iii).

145.    Public entities must make reasonable modifications to their policies, practices, and procedures when necessary to avoid discrimination against individuals with disabilities. *Id.* § 35.130(b)(7)(i).

146.    Public entities "shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others" and "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." *Id.* § 35.160(a)(1)–(b)(1).

147.    To be effective, "auxiliary aids and services must be provided in . . . such a way as to protect the privacy and independence of the individual with a disability." *Id.* § 35.160(b)(2).

148.    Auxiliary aids and services include, but are not limited to, "screen reader software; magnification software; optical readers; . . . accessible electronic and information

technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." *Id.* § 35.104.

149.     Because they are blind, Daniel Frye, Mary Jean Shiner, and other NFB and NFB-NH members are individuals with disabilities protected by the ADA. Because he has Muscular Dystrophy, Jeffrey Dickinson is an individual with a disability protected by the ADA. Because of their disabilities, GSIL clients are individuals with disabilities protected by the ADA. *See* 42 U.S.C. § 12102; 28 C.F.R. § 35.108.

150.     Daniel Frye, Mary Jean Shiner, Jeffrey Dickinson, NFB and NFB-NH members, and GSIL clients are eligible to vote in New Hampshire and intend to vote in the November 3, 2020 general election and other future elections conducted by Defendants. Daniel Frye, Mary Jean Shiner, Jeffrey Dickinson, NFB and NFB-NH members, and GSIL clients are qualified to receive voting services from Defendants, including to receive information from the Secretary of State's website and to vote absentee during and after the pandemic, and are entitled to the protections afforded under the ADA. *See* 42 U.S.C. § 12131(2).

151.     Defendant Gardner heads the New Hampshire Department of State. The New Hampshire Department of State is a public entity subject to Title II of the ADA. *See* 42 U.S.C. § 12131(1).

152.     The absentee voting program is a service, program, or activity provided by Defendants.

153.     The Secretary of State's website is a service, program, or activity provided by Defendants.

154.    Defendants' absentee voting program discriminates against Plaintiffs and other print-disabled voters because these individuals cannot register to vote absentee, apply for an absentee ballot, or vote via absentee ballot secretly and independently, as other voters can.

155.    Defendants have also discriminated against Plaintiffs and other print-disabled voters by failing to make information related to voting on their website accessible.

156.    Defendants have failed to provide Plaintiffs and other print-disabled voters with an opportunity to participate in New Hampshire's absentee voting program and learn information from their website that is equal to the opportunity provided to other voters who do not have disabilities.

157.    The technology to make their absentee voting program and website accessible is readily available to Defendants and would allow independent, private absentee registration and absentee voting for print-disabled people and effective communication with print-disabled people through the website.

158.    Defendants could make reasonable modifications to their absentee voting program by offering an accessible means of absentee registration and absentee voting to Plaintiffs and other voters who are print-disabled, and by maintaining a fully accessible website.

159.    Defendants have failed to afford Plaintiffs and other print-disabled voters auxiliary aids and services necessary to afford them effective communication in the absentee voting program and website.

160.    Defendants have excluded and continue to exclude Plaintiffs and other voters who are print disabled from participation in, and denied them the benefits of, or otherwise discriminated against them in, their absentee voting program and access to their website.

161.    As a result of Defendants' actions and inactions, Plaintiffs and those similarly situated have suffered and will continue to suffer irreparable harm. They have suffered and continue to suffer from discrimination and unequal access to Defendants' programs, services, or activities. And in the absence of injunctive relief, Plaintiffs and those similarly situated will be denied their right to receive election-related information and to register absentee and vote by absentee ballot privately and independently.

162.    Defendants' failures to meet their obligations to provide disabled voters with an equal opportunity to participate in their absentee voting program and receive information from their website are ongoing violations of the ADA and its implementing regulations. Unless restrained from doing so, Defendants will continue to violate the ADA and to inflict irreparable injuries for which Plaintiffs have no adequate remedy at law.

163.    Plaintiffs are entitled to injunctive and declaratory relief as well as reasonable attorneys' fees and costs.

## COUNT II
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. § 794 *et seq.*

164.    Plaintiffs incorporate the allegations in the preceding paragraphs, as if alleged herein.

165.    Plaintiffs Daniel Frye, Mary Jean Shiner, Jeffrey Dickinson, NFB and NFB-NH members, and GSIL clients are individuals with disabilities who are eligible to vote and eligible to vote absentee and, thus, are protected by Section 504. The Department of State receives federal financial assistance and thus is subject to Section 504. 29 U.S.C. § 794.

166.    Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." *Id.* § 794(a).

167.    Section 504 defines "program or activity" to include "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government" or "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government[.]" *Id.* § 794(b)(1).

168.    Such federally funded entities may not, in providing aids, benefits, or services, "[d]eny a qualified handicapped person the opportunity accorded others to participate in the program or activity receiving Federal financial assistance." 28 C.F.R. § 42.503(b)(1)(i).

169.    Such federally funded entities must also "insure that communications with their . . . beneficiaries are effectively conveyed to those having impaired vision and hearing," *id.* § 42.503(e), and, if the entity has 15 or more employees, must "provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance," *id.* § 42.503(f).

170.    Defendant Gardner is the Secretary of the New Hampshire Department of State, which is an agency or instrumentality of New Hampshire that receives federal financial assistance and thereby is subject to the requirements of Section 504.

171.    The absentee voting program is a service, program, or activity provided by Defendants.

172.    The Secretary of State's website is a service, program, or activity provided by Defendants.

173.     Plaintiffs are people with disabilities under Section 504.

174.     Plaintiffs are eligible to vote in New Hampshire. They are eligible to vote
absentee and will continue to be eligible to vote absentee after the pandemic. They are thus
qualified individuals with disabilities entitled to the protections of Section 504.

175.     Defendants have failed and continue to fail to meet their obligations to provide
print-disabled voters an opportunity to register to vote, to vote, and to receive information from
their website that is equal to the opportunity provided to other voters.

176.     Defendants could make reasonable modifications to their absentee voting program
by offering an accessible means of absentee registration and absentee voting to Plaintiffs and
other voters who are print-disabled, and by maintaining a fully accessible website.

177.     In denying use of an accessible absentee voting program and in communicating
voting-related information in inaccessible formats, Defendants refuse to provide an auxiliary aid
or service that would allow Plaintiffs an equal opportunity to vote and receive information about
elections in New Hampshire.

178.     Accordingly, Defendants have discriminated and continue to discriminate against
Plaintiffs with respect to their absentee voting program and the Secretary of State's website.

179.     As a result of Defendants' actions, Plaintiffs have suffered and will continue to
suffer irreparable harm; they have suffered and continue to suffer from discrimination and
unequal access to Defendants' absentee voting program and website.

180.     The technology to make their absentee voting program and website accessible is
readily available to Defendants and would allow independent, private website use, absentee
registration, and absentee voting for print-disabled people.

181.     In the absence of injunctive relief, Defendants will continue to deny Plaintiffs

their right to receive information from Defendants' website and participate in their absentee

voting program privately and independently in future elections conducted by Defendants.

182.    Unless the requested relief is granted, Plaintiffs will suffer irreparable harm in

that they will be discriminated against and denied equal access to the fundamental right to vote.

183.    Plaintiffs are entitled to injunctive and declaratory relief as well as reasonable

attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor and

award them the following relief:

184.    A permanent injunction prohibiting Defendants from violating the ADA and

Section 504 and requiring Defendants to remedy their absentee voting program by allowing

voters who qualify for absentee registration to register through an entirely electronic process;

ensuring that they create and maintain their election-related webpages and forms in accessible

formats offering Plaintiffs all of the same information and the same transactions, with

substantially equivalent ease of use, that non-disabled people receive; implementing a remote

accessible vote-by-mail system for obtaining, marking, and returning absentee ballots by

Plaintiffs and those similarly situated for all future elections conducted by Defendants; and

issuing the guidance and conducting the training necessary of state and local officials to carry out

the terms of the injunction;

185.    A declaration that Defendants have violated and continue to violate the ADA and

Section 504;

186.    An award of Plaintiffs' reasonable attorneys' fees, litigation expenses, and costs;

and

187.    Such other and further relief in favor of Plaintiffs as the Court may deem just and proper.

Respectfully submitted,

DISABILITY RIGHTS CENTER-
NEW HAMPSHIRE, INC.

By:    /S/ Pamela E. Phelan
       Pamela E. Phelan (#10089)
       Pamelap@drcnh.org
       (603) 491-4157 (mobile number)
       James Ziegra (#20689)
       jamesz@drcnh.org
       (603) 661-7314 (mobile number)
       64 North Main Street, Ste. 2
       Concord, NH 03301
       (603) 228-0432 (general office number)
       (603) 225-2077 (general office fax number)

       Gregory P. Care (*pro hac vice*)
       gpc@browngold.com
       (443) 534-5641 (mobile number)
       Abigail A. Graber (*pro hac vice*)
       agraber@browngold.com
       (410) 215-0110 (mobile number)
       BROWN, GOLDSTEIN & LEVY, LLP
       120 East Baltimore Street, Suite 1700
       Baltimore, Maryland 21202
       (410) 962-1030 (general office number)
       (410) 385-0869 (general office fax number)

       *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a copy of this Amended Complaint was served on all counsel of record via ECF.

Dated: October 6, 2020                    /S/ Pamela E. Phelan
                                          Pamela E. Phelan